No. 46,564

GEORGE STEFFEK D/B/A GEORGE STEFFEK CONSTRUCTION COMPANY, *Appellant*, v. ROBERT A. WICHERS AND PROFESSIONAL PHOTOGRAPHERS COLOR CORPORATION, Beloit, Kansas, *Appellees*.

(507 P. 2d 274)

Opinion filed March 3, 1973.

*D. V. Romine*, of Abilene, argued the cause, and *C. Stanley Nelson*, of Hampton, Royce, Engleman & Nelson, of Salina, was with him on the brief for the appellant.

*Tweed W. Ross*, Beloit, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action to recover the balance due on a construction contract. George Steffek, d/b/a George Steffek Construction Company, (plaintiff-appellant) alleged in his petition that a sum of $25,003.54 remained due and owing from Robert A. Wichers and Professional Photographers Color Corporation (defendants-appellees) for the construction of a color photography processing plant in Beloit, Kansas. The alleged sum remaining due included $13,354.80 for extra work.

At the close of the plaintiff's evidence, the trial court sustained the defendants' motion for a directed verdict because the architect had not issued his final certificate of completion as required by the written contract. Thereupon the plaintiff duly perfected an appeal.

The contract signed by the parties was entitled: "THE STANDARD FORM OF AGREEMENT BETWEEN OWNER AND CONTRACTOR."

The contract provided that the form was to be used only with the "Latest Edition" of American Institute of Architects (AIA) Document A201, General Conditions of the Contract.

The agreement recited that it was made the 26th day of March, 1966 and that Jones and Gillam, Architects-Engineers, Ellsworth, Kansas, were "acting as and in these contract documents" as the architect; "and shall do everything required by this Agreement the General Conditions of the Contract, the Specifications and Drawings."

Article 2 of the agreement stated the work to be performed would be commenced as soon as materials could be obtained and stated the completion date to be September 15, 1966.

Article 3 of the agreement stated the owner shall pay to the contractor for the performance of the contract, subject to additions and deductions, the sum of $186,984. The record shows a computation was made under Article 3 giving a base bid of $189,417 and deductions of $2,433, which were itemized. The resulting sum reflects the amount actually agreed upon for the construction of the building.

Article 4 of the agreement provided that on or about the 10th day of each month the owner would make payments on account of the contract to the contractor in an amount to be computed as 90% of the value of the contract prices of labor and materials incorporated in the work and 90% of materials suitably stored at the site of the work up to the first day of that month, as estimated by the architect, less the aggregate of previous payments. It further provided that upon *substantial completion* of the entire work a sum sufficient to increase the total payments to 90% of the contract price would be paid.

Article 5 stipulated final payment shall be due 30 days after substantial completion of the work provided the work be then fully completed and the contract fully performed. Upon receipt of written notice that the work was ready for final inspection and acceptance, the architect was to promptly make such inspection. When the architect found the work acceptable under the contract and the contract was fully performed, he was to promptly issue a final certificate, over his own signature, stating the work provided for in the contract had been completed and accepted by him under the terms and conditions thereof. At that point the entire balance found to be due the contractor, and noted in said final certificate would become due and payable. Article 5 further provided that

if after the work had been substantially completed, full completion of the work was materially delayed through no fault of the contractor, to which fact the architect must certify, the owner would, upon the certificate of the architect, and without terminating the contract, make payment of the balance due for that portion of the work fully completed and accepted.

AIA Document A201, General Conditions of the Contract, which was made a part of the agreement by reference, is material to the determination of this case. The General Conditions stated under "Definitions" (h) the date of substantial completion of a project or specified area of a project is the date when construction is sufficiently completed, in accordance with the contract documents, so that the owner can occupy the project or specified area of the project for the use it was intended.

Article 15 of the General Conditions stated in essence that the owner could, without invalidating the contract, order extra work or make changes by altering, adding to or deducting from the work, the contract sum being adjusted accordingly. All such work was to be executed under the conditions of the original contract except that any claim for extension of time caused thereby would be adjusted at the time of ordering such change. This article further stated that no extra work or change would be made *unless it was in pursuance of a written order from the owner signed or countersigned by the architect,* or a written order from the architect stating that the owner had authorized the extra work or charge. It further provided that *no claim for an addition to the contract sum would be valid unless so ordered.*

Articile 16 of the General Conditions stated if the contractor made any claim that instructions or drawings would involve extra cost under the contract, he was to give the architect written notice thereof within a reasonable time after the receipt of such instructions, or in any event before proceeding to execute the work. No such claim would be valid unless so made.

Article 19 stated the contractor would promptly remove from the premises all work condemned by the architect as failing to conform to the contract and that the contractor would promptly replace and re-execute his own work in accordance with the contract and without expense to the owner. If the contractor did not remove such condemned work within a reasonable time, fixed by written notice, the owner was empowered to remove and store the material

at the expense of the contractor. If the contractor did not pay the expenses of such removal within ten days time thereafter, the owner could, upon ten days written notice, sell such materials at auction or at private sale and give an accounting of the net proceeds thereof, after deducting all the costs and expenses which should have been borne by the contractor.

Article 20 provided for correction of the work after substantial completion. It stated in essence that the contractor would remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which appeared within a period of one year from the date of substantial completion as defined within the "General Conditions." It provided the owner was to give notice of observed defects with reasonable promptness. All questions arising under Article 20 were to be decided by the architect, subject to arbitration not withstanding final payment.

Article 26 authorizes the architect to withhold, or, on account of subsequently discovered evidence, to nullify the whole or a part of any certificate to such extent as may be necessary in his reasonable opinion to protect the owner from loss on account of defective work not remedied.

Article 38 provided,

"The Architect shall be the Owner's representative during the construction period. . . .

"The Architect shall be, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance. He shall side neither with the Owner nor with the Contractor, but shall use his powers under the Contract to enforce its faithful performance by both.

"In case of the termination of the employment of the Architect, the Owner shall appoint a capable and reputable Architect against whom the Contractor makes no reasonable objection, whose status under the contract shall be that of the former Architect; any dispute in connection with such appointment shall be subject to arbitration."

Article 39 provided that the architect would within a reasonable time, make decisions on all claims of the owner or contractor and on all other matters relating to the execution and progress of the work. The architect's decision in matters relating to artistic effect was to be final, if within the terms of the contract documents. Under Article 39, all of the architect's decisions were subject to arbitration. If the architect failed to render a decision within ten days after the parties had presented their evidence, either party could then demand arbitration. If the architect rendered a decision after arbitration proceedings had been initiated, such decision

could be entered as evidence but could not disturb or interrupt such proceedings except where such decision was acceptable to the parties concerned.

The appellees made payment to the appellant as building progressed in accordance with the written contract until certificate for payment No. G-8 was submitted. This certificate covered the period from October 6, 1966, to November 2, 1966. It should be noted this entire period was after the recited contract completion date of September 15, 1966. Certificate for payment No. G-8 showed the original contract sum to be $186,984.00 and the total completed to date to be $182,570.57. The 10% retainage was stated to be $18,257.05 resulting in a total earned less retainage of $164,-313.52. Previous payments were shown to be $154,253.66. The certificate was for $10,059.86 and was signed and approved by Jones and Gillam Architects-Engineers on November 10, 1966. No part of this certificate was ever nullified by the architect or otherwise withdrawn.

The appellant's petition set forth the computations he made to arrive at the sum of $25,003.54, claimed to be due.

A letter written by Robert Wichers, as general manager for Profesisonal Photographers Color Corporation to Jones and Gillam Architects dated November 18, 1966, states in part,

"Please write to Mr. Steffek telling him that you are unable to authorize any further payments at this time. The break down of the figures is as follows. I have personally paid Steffek $5,000 in addition to the $154,253.66 that he has been paid otherwise. This makes a total payment of $159,253.66. The total contract was for $186,984. We have credits coming for the following: (these figures will be approximate)—$6,000 credit for railings and hand-railings, $1500 credit for unused hardware allowance and $750 credit for brick allowance. The total contract with these credits subtracted would then be $178,734. Subtracting $17,873.40, which is withheld because of the retainage required, would make a net total balance payable of $160,860.60. Steffek, by his own admission shows a balance to finish of $4413.43. By subtracting the total amount paid and this incompleted work from the amount due, there is a net credit due us of $2806.49. This amount should be more than ample to cover any extras that are involved. There are other unadjusted credits and costs due us that you will resolve on the final settlement and final inspection.

"We have been receiving communications from a number of Steffek's suppliers. Apparently he has paid very few of his supply bills. Since he is bonded I assume that this is not a problem."

At this point the parties are clearly in agreement as to the total amount actually paid to the appellant by the appellees, $159,253.66.

Even though certificate for payment No. G-8 was signed by the

architect as required by the contract between the parties, Wichers refused to pay the full $10,059.86 authorized by certificate G-8. He paid only $5,000, leaving an unpaid balance of $5,059.86 due according to the certificate. Nothing has been paid since the above letter was written.

Application G-8, approved by the architect, shows approximately 98% or more of each category of the work had been completed.

At this point the building was substantially completed and late in December, 1966, the owner began moving into the building. He commenced color processing in late January, 1967, and has occupied and used the building as a color photography processing plant since that time. Robert Wichers testified he was general manager and president of Professional Photographers Color Corporation, and that he is "proud of the building." He agreed with a comment of a Kodak executive regarding the building who said: "I don't know of another enterprise in the country as well equipped for such excellent customer service." Other comments by Kodak executives were: "The most outstanding color laboratory in the United States; amazing to find such a laboratory in a community of this size"; and "working conditions were ideal."

On November 18, 1966, in his letter to the architect, it is noted, Robert Wichers made no charge that the work was not completed to the extent claimed; or that some of the work was deficient and would have to be re-done; or that the work was not done in accordance with plans and specifications. Rather, Mr. Wichers advised the architect not to authorize further payments to Steffek because Steffek had been overpaid. Thus, it is apparent, approximately one month prior to Wichers' moving into and otherwise accepting the building, he did not complain of deficiencies or of the quality of the work.

On September 19, 1967, more than one year after the contract completion date, the architect sent a letter to Steffek enumerating various items which were to be corrected or finished before the architect's office could consider the project finished in accordance with the terms of the contract agreement as set forth in the plans and specifications. This was approximately nine months after Wichers began moving into the building.

The record discloses no final certificate of completion was ever issued by the architect in this case, and, upon failure of this condition, the trial court sustained a motion for a directed verdict at the close of the appellant's evidence.

The appellant does not urge on appeal that this court rewrite the contract, but rather that it conclude that the appellees' use and occupancy of the building and acceptance with knowledge of deficiencies constitutes a waiver of the condition precedent in the contract.

Wichers testified he arranged to pay the architect $10 per hour plus mileage rather than the usual percentage fee of 1½%, because he did not believe the architects would spend anywhere near 450 hours on the job. Wichers further testified, *"The architect was to and did perform only those services which we requested."* (Emphasis added.) Mr. Wichers identified the applications for payment and certificates for payment (G-1 to G-7 incl.) issued in connection with the job, and said, "I did approve all of these." He also said he did not believe the architects were on the job each time they made approval of the certificates, and added: "I imagine that they assumed if *we* were willing to pay the check that it was acceptable." (Emphasis added.)

It is evident Wichers was referring to the appellees when he used the expression "we" in the above testimony. It is abundantly clear from the record the provisions of the written contract were ignored in changing the plans and specifications for the building and in making additions. Extra work and installations were ordered by Wichers which Steffek performed, and deletions and changes were made for which Steffek gave Wichers credit. In most of these matters the architect was never consulted, and clearly no orders were ever signed by the architect as required by the contract authorizing the change or addition.

Where, as here, the architect performed only those services requested by the appellees, final payment could be completely thwarted by failure of the appellees to call upon the architect to make the final inspection and acceptance. In fact, this appears from the record to have occurred to defeat or delay final payment, because the letter from the architect enumerating items for completion or correction was first submitted to Steffek by the architect more than one year after the contract completion date, and more than nine months after the appellees moved into the building for occupancy.

It must be noted, when the appellees moved into the building, the 10% retainage upon substantial completion of the building had not been paid, and it has not been paid to date. While the appellant does not assert bad faith on the part of the appellees, the

record tends to suggest it. Wichers in his letter of November 18, 1966, deducted the 10% retainage before he concluded that Steffek had been overpaid.

Most of the items enumerated in the architect's letter of September 27, 1967, for correction or completion were minor or trivial in nature as admitted by Wichers in his testimony. Many of these items had been completed or corrected prior to the hearing in the trial court.

As the building was being constructed Wichers knew about two major deficiencies. When the masonry work was just three or four feet above the first floor windows, he knew that the steel bars had not been placed in the windows, but in spite of this knowledge he did not suggest, nor did the architect, that the steel bars be inserted either by removing the inside block or by tearing the walls down. Instead Wichers was satisfied with leaving the bars out, inasmuch as he wanted the building completed as soon as possible. Wichers also knew the cement base, prior to installation of the tile, was not good. The tile-layers were careful in the west portion of the processing room but did not take enough time to lay the tile on the east side to make it drain well. Wichers testified:

". . . I told the architect, the superintendent and Steffek that I didn't accept it. The architect reviewed the work and the tile people promised to and did come back and redo this area, but it still didn't work. I pointed this out to the architect and I believe he required it to be done. I did not attempt to exercise rights under the general conditions and have the tile removed and done properly. We had no choice but to move the equipment in on top of the tile and get going before we went broke. I would have probably had the legal right to have the work done and have it deducted from the contractor's bill."

The appellees' position is that they took possession under the substantial completion clause of the contract. They contend final payment was not due until thirty days after substantial completion, provided the work was then fully completed and the contract fully performed. Under these provisions in the contract they argue the architect's certificate of final completion was an absolute condition precedent to final payment.

The appellant relies upon rules stated in *Lumber, Inc., v. Cummins*, 163 Ohio St. 264, 126 N. E. 2d 323. There the Supreme Court of Ohio was faced with facts similar to those in the instant case. The trial court dismissed the contractor's suit against the owner for the unpaid balance due under the contract for the construction of

a home. There, as here, the owner filed a cross-petition seeking to recover damages for claimed faulty construction. In the opinion the court said:

"The primary question presented may be stated as follows: Where a contractor enters into a written contract with the contractee to furnish the materials and build a house on the land of the latter, by the terms of which contract the unpaid balance of the contract price is not to become due and payable until there has been issued by a mortgage lender, employed by the contractee to finance the building project, an approval certificate as to the construction of the house, and where in the meantime the contractee takes possession of and occupies such house as his property and permanent residence, may such contractor maintain a suit to recover the balance of the contract price, notwithstanding there has been no issuance of an approval certificate by such mortgage lender?

"In the absence of fraud, bad faith, failure to exercise honest judgment, or a waiver on the part of the contractee, such a stipulation constitutes a condition precedent to the maintenance of an action to recover the sum claimed to be due under the contract. . . ."

"However, where the owner of a building built for him under contract substantially performed accepts and takes possession of it, knowing or having reason to know that the construction is defective or incomplete, such acceptance will be deemed a waiver of such a condition precedent and the contractor will be entitled to recover the amount due under the contract less deductions for deficiencies. . . ." (pp. 266-267.)

The Ohio court reasoned that where an owner of a lot has chosen to go into the occupancy and use of a building erected upon it, thereby appropriating to himself the fruits of the contract, he ought, on the plainest principles of justice, to pay for them at the contract price less such sums for delay, defective work or inferior materials as the owner is in equity entitled to have deducted. The court further noted that the doctrine of waiver has a special significance and application in a building contract case, where the building is constructed on the premises of the contractee owner; and the work on the building, even if rejected, necessarily inures to the benefit of the owner who received the contractor's materials supplied and the services performed. The Ohio court ordered further proceedings in which the owner would be permitted to show the defects in construction.

The Ohio court went further and reached the same conclusion as to waiver from a consideration of the specific terms of the contract between the parties. It provided that:

" 'Final inspection and issuance of an approval certificate or report by the mortgage lender * * * or any use or occupancy of the house by the

owner shall be deemed completion of the work to be done hereunder and acceptance thereof by the owner. . . .'" (p. 268.)

While our court has not ruled precisely on the question of whether an owner's occupancy and full use of a building for its intended purpose is deemed to constitute a waiver of the architect's final certificate, it has recognized the doctrine of waiver, and has applied it in connection with an architect's final certificate in *Humphrey v. Flaherty*, 98 Kan. 634, 158 Pac. 1112. The building contract there required that payments should be made to the contractor as the work progressed, and when it was completed upon certificates issued by the architect. The court held a provision in a building contract for the architect's certificate and approval may be waived, and the waiver may be implied from the acts of the owner.

In a later case the court was concerned with a waiver of a right to rescind in *Morse v. Kogle*, 162 Kan. 558, 178 P. 2d 275. The court there held that if after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.

Kansas has recognized that where there has been substantial performance of a building contract, the measure of damage for errors or omissions in construction, which can be remedied by repair, is the reasonable and necessary expense to make the building conform to the contract rather than the difference between the value of the building as constructed and that contracted for. (*Thompson Construction Co. v. Schroyer*, 179 Kan. 720, 298 P. 2d 239.)

Upon all the facts and circumstances presented by the record herein, it may reasonably be said the appellees waived the condition in the building contract which provided for final payment upon inspection and approval by the architect, evidenced by the issuance of a final certificate of the architect. The waiver is implied from the conduct of the appellees throughout the construction of the building in making changes and additions without resort to, or consultation with, the architect and in complete disregard of the terms of the contract; their conduct in refusing to pay the balance due under certificate No. G-8 issued by the architect; their conduct in moving into and occupying the building; and their delay in calling for final inspection by the architect and in having submitted,

through the architect, the items which were to be either corrected or finished before the project would be considered complete.

Accordingly, the appellant is entitled to pursue his action to recover the amount due under the contract, less deductions for deficiencies, and adjustments for alterations, changes and additions.

The judgment of the lower court is reversed and the case is remanded with directions to proceed with the trial on the merits.