No. 47,599

COONROD & WALZ CONSTRUCTION COMPANY, INC., *Plaintiff-Appellant*, v. MOTEL ENTERPRISES, INC., et al., *Defendant-Appellee*; MOTEL ENTERPRISES, INC., *Plaintiff-Appellee*, v. COONROD & WALZ CONSTRUCTION COMPANY, INC., *Defendant-Appellant*; EARL W. HAMMAN, INC., *Plaintiff-Appellee*, v. THE WESTERN CASUALTY AND SURETY COMPANY, et al., *Defendant-Third Party Plaintiff-Appellant*, MOTEL ENTERPRISES, INC., et al., *Third Party Defendant-Appellee*.

(535 P. 2d 971)

Opinion filed May 10, 1975.

*Jerry L. Berg*, of Bryant, Cundiff and Shanahan, of Wichita, argued the cause, and *Glenn J. Shanahan*, of the same firm, was with him on the brief for the appellants, Coonrod and Walz Construction Company, Inc.

*Robert Martin*, of Martin, Pringle, Schell and Fair, of Wichita, argued the

cause, and *John P. Woolf* and *J. Taylor Neuschwander,* of the same firm were with him on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: The ultimate question in this case is the balance due the general contractor from the owner for the construction in 1969 and 1970 of the high-rise Holiday Inn Plaza motel in Wichita. The answer depends in large part on whether the guaranteed-maximum-cost provision of the construction contract continued in effect, or whether the parties by their conduct had waived that provision and converted the contract into a straight cost-plus contract. The trial court enforced the guaranteed maximum, and in its judgment allowed the contractor to recover unpaid amounts in excess of that figure only to the extent that the additional amounts were found to have been the result of changes, modifications and additions ordered by the owner. The contractor has appealed.

The facts may be gleaned from the somewhat complex procedural picture presented by the record. There were initially three separate lawsuits below. The first was brought on February 12, 1971, by Earl W. Hamman, Inc., the painting subcontractor, for an unpaid balance of $89,402.00. The defendants in that action were the general contractor, Coonrod & Walz Construction Company, Inc. ("C. & W.") and the surety on its bond, The Western Casualty and Surety Company. Those defendants did not contest the amount of Hamman's claim, but asserted that the parties with true liability were the owner of the motel, Motel Enterprises, Inc. ("Motel"), and its agent Robert S. Lightner. This assertion was made both by answer and by third-party petition against Motel and Lightner.

In the meantime, on March 2, 1971, Motel filed the second suit, a declaratory judgment action against C. & W. asking that the contract between the parties be construed as imposing a guaranteed maximum cost of $3,250,000.00.

C. & W. responded two days later by filing its own suit (the third) to foreclose its mechanic's lien for $506,962.99. It named as defendants: the owner, Motel Enterprises, Inc.; Garvey Center, Inc., which owned the ground on which the building was located; Robert S. and his brother Eugene W. Lightner, who were to have an interest in the operation of the motel; and Massachusetts Mutual Life Insurance Company (which denied any interest in the project and whose interest, if any, never did appear).

C. & W. also answered Motel's declaratory judgment action, al-

leging among other things that it had completed the contract, that there had been numerous changes ordered by Motel which had the effect of modifying the contract, that it had billed Motel for the work and that Motel had accepted and approved all its work and bills, that this amounted to an accord and satisfaction, and that Motel owed it $506,962.99. C. & W. also asserted that the controversy was not of a sort suitable for resolution by declaratory judgment, and should be resolved in its mechanic's lien foreclosure action.

In C. & W.'s lien foreclosure action, Garvey Center, Inc. answered separately, admitting that it owned the land but denying that it had any interest in the motel building or any contract with C. & W. The other defendants filed a joint answer denying the allegations of the petition except that they admitted the execution of the construction contract with its $3,250,000.00 guaranteed maximum and that the building had been completed. They admitted making fourteen monthly payments to C. & W., but alleged that the payments were made as a "draw" and did not represent full approval or an accord and satisfaction. (The fifteenth monthly bill was only partially paid, the sixteenth and seventeenth not at all. It was the inability of the parties to resolve their differences over the total costs which precipitated the litigation.)

With the issues thus joined the trial court first took up the claim of Hamman, the painter. It found that Hamman's relationship to the other parties was that of a subcontractor of C. & W., so that its claim was recoverable from C. & W. and Western Casualty, the surety on C. & W.'s bond. (In due course Hamman recovered a judgment against C. & W. which was paid; Hamman and Western Casualty were thereafter no longer interested in this litigation.) C. & W.'s third-party petition against Motel and Robert S. Lightner was left pending.

At this point, on June 30, 1971, an order was entered consolidating the three suits for trial, that is, C. & W.'s lien foreclosure action, its unresolved third-party petition, and Motel's declaratory judgment action.

On September 8, 1971, the court held a hearing on the declaratory judgment aspect of the consolidated actions. It had before it at that time three documents which together formed the written contract between Motel and C. & W. These were (1) an American

Institute of Architects "standard form of agreement" dated February 28, 1969, (2) a "supplemental agreement" dated the same day, and (3) a second "supplemental agreement" dated May 15, 1969. Paragraph 6.1 of the standard form agreement called for the owner (Motel) to reimburse the contractor (C. & W.) for the "cost of the work" and to pay a "contractor's fee" fixed elsewhere at $160,000. Paragraph 6.2 provided:

"The maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of Two Million Nine Hundred Thousand dollars ($2,900,000.00); such Guaranteed Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 8."

(The form indicated that Paragraph 6.2 should be deleted "if there is no Guaranteed Maximum Cost.")

The first (contemporaneous) supplemental agreement recited that the contract was on a cost-plus fixed fee basis because "the specific plans and specifications for the construction of this building have not been finalized, specified or determined to the extent that Contractor is able to make a firm bid." It went on to say that while the owner hoped to complete the building for the $2,900,000 called for in the form agreement and the contractor would try to do so, "from the general plans and specifications and on present information as heretofore submitted, Contractor estimates that such total costs for the construction of this project will exceed said sum of $2,900,000.00, possibly to the extent of a total cost of $3,250,000.00." The parties therefore agreed, among other things:

"1. That the maximum cost to Owner, including the total cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of $3,250,000.00, and Section 6.2 of said Standard Form of Agreement is hereby changed and modified to that extent.

"2. Contractor does agree that Contractor's fixed fee of $160,000.00, as provided in said Standard Form of Agreement, shall not be increased or decreased and it is understood and agreed that Contractor is to receive and be paid the fixed fee of $160,000.00 in any event and even though such total costs should amount to less than $2,900,000.00.

"3. Owner is to have the right and privilege of modifying and changing any plans, specifications and requirements relative to the construction of this project, provided that Contractor is given timely and sufficient notice thereof and provided further that Owner pay any costs or losses, if any, caused to Contractor by reason of any such modifications or changes.

"4. Owner may, with the approval of Contractor, award separate contracts for portions of the work; provided, however, that any such separate contracts shall remain under the complete control of the Contractor, including applica-

tions for payment, changes and all items and shall be included in determining guaranteed maximum cost, the same as if it were a subcontract of the Contractor."

Robert S. Lightner was designated as the "Architect" for the purposes of approving the work, and as the agent of the owner for the purpose of authorizing changes, additions or deletions from the original plans. Under the form agreement all change orders were to be in writing.

The second supplemental agreement, dated May 15, 1969, was substantially identical to the first, with some changes in tense to indicate the parties' past as well as future operations. (By that time two change orders had been executed which had the effect of making direct contractors of those who had been subcontractors for electrical work, mechanical work, the slip forms, glazing and elevator installation. Under paragraph 4, however, their work was still to be considered "in determining guaranteed maximum cost.") This second supplemental agreement contained the identical guaranteed maximum cost provision as paragraph 1 of the first, quoted above, but in paragraph 2 it provided that the fixed fee would be the same whether the cost was less "or more" than $2,900,000.00.

At the conclusion of the September 8, 1971, hearing the court rendered a declaratory judgment construing these three documents as follows:

"3. The contract between Motel Enterprises, Inc. and Coonrod & Walz Construction Company, Inc. provides for a cost of work plus fixed contractor's fee not to exceed a guaranteed maximum cost of $3,250,000.00 for the construction and finishing of the Holiday Inn Highrise Motel, subject to increases or decreases for changes, additions, variations and modifications in the work."

No further pretrial proceedings were had and no pretrial order was entered. Trial to the court was commenced on September 27, 1971, with C. & W. as plaintiff introducing its evidence. The primary defendants were Motel and Robert S. Lightner. On October 1, after four days of trial, and while plaintiff's case was still in progress, the court on its own motion called a conference with counsel in order to define and establish the issues to be decided. The result was an order which recited:

"Thereupon, the court, having heard and considered the statements and arguments of counsel, *the documentary evidence and the oral testimony adduced thus far in the case,* and having considered the rulings of the court made in the declaratory judgment action, Case No. C-21446, between these same parties, also one of the consolidated actions captioned above, finds that the following order should be entered:

"1. Plaintiff and defendants are each bound by the terms and provisions of the written contract and the contract documents as found and ordered by the court in the declaratory judgment action, Case No. C-21446.

"2. In view of the contract between the parties, plaintiff would be entitled to recover from defendants in excess of the guaranteed maximum cost for construction and finishing of the Holiday Inn Highrise Motel, as reflected by the contract documents, *only to the extent of modifications, changes or additions to the work described and set forth in the contract documents.*

"3. The precise issues to be determined in the matter presently in trial are as follows:

"(a) What modifications, changes or additions were made from the plans and specifications for the Holiday Inn Highrise Motel?

"(b) What were the costs of such modifications, changes or additions?

"(c) What credits, if any, are defendants entitled to by reason of such modifications, changes or additions?

"(d) What is the resulting net change in the guaranteed maximum cost?" (Emphasis added.)

With the issues thus defined the trial was recessed. It resumed on October 12, for four more days of testimony and, after a second recess, for yet another four days beginning November 8, 1971. (The transcript exceeded 1800 pages; in this court the record contains 470 pages of the judicial proceedings in Volume I, plus two volumes of exhibits, each of almost the same mass as Volume I.) At the conclusion of the trial the matter was taken under advisement and the parties submitted requested findings and conclusions.

On February 4, 1972, the trial court filed its findings and conclusions. After making passing reference to Motel's early negotiations and its rejection of bids made by both C. & W. and a New Mexico contractor, in Finding No. 1 the court recited the documents constituting the present contract. No. 2 recited the court's ruling that the contract was a cost plus fixed fee contract with a guaranteed maximum, which could be exceeded only by the amount of costs attributable to "changes, modifications or additions to the original planned construction." No. 3 recited the guaranteed maximum of $3,250,000.00. No. 4 recited the completion of the building in December, 1970, at a cost which "substantially exceeded the guaranteed maximum cost of the contract." The heart of the findings was in Nos. 5 through 9:

"No. 5

"After a protracted trial the exact amount in litigation remains somewhat elusive. Plaintiff in its petition prayed for $506,962.99. Plaintiff's vice-president, H. Doyle Walz, who executed the contract on behalf of plaintiff, testified that the amount unpaid was $489,880.50. Plaintiff's job coordinator on

this project, Charles Sigler, testified that the actual unpaid excess amounted to $573,961.00, but that plaintiff was not actually seeking recovery of that amount. Plaintiff's counsel in their briefs to the Court at the conclusion of the trial have argued that plaintiffs are entitled to the amount of $518,289.70. The defendant contends that while there was a net amount of $207,220.90 due plaintiff for changes, all but $41,607.38 has been paid. The confusion that exists is due in large part to the fact that literally hundreds of changes were made in the work as construction progressed, and that neither party hereto made or kept any record of most of them as they occurred. Furthermore, while architectural plans were complete prior to the execution of Exhibit No. 1, and are in evidence as Exhibit No. 9, the structural plans were not complete, and when completed in various stages during construction, sometimes raised the question as to whether they amounted to a change or an addition to the originally contemplated work.

"No. 6

"The contract provided that the defendant Robert S. Lightner was designated by the defendant Motel Enterprises as 'Project Manager' to represent said owner in conjunction with the construction, and further provided that said defendant Robert S. Lightner should be deemed to be the 'Architect' for all purposes under the General Conditions of the contract. The General Conditions of contract in Article 12 provided that all changes in the work were to be authorized by change orders, and further provided that change orders were to be written orders to the contractor, signed by the owner and architect; or alternatively by the architect alone, provided he had written authority from the owner for such procedure (which authority was contained in Paragraphs 6 and 8 of the Supplemental Agreements which were a part of the contract.)

"No. 7

"The evidence discloses, and the Court finds, that the plaintiff-general contractor and the defendant-owner, along with its designated 'Project Manager' and 'Architect' paid scant heed to the above provisions in Article 12 of the General Conditions of the contract. The defendant Robert Lightner, as architect and owner's representative, prepared no written change orders whatsoever throughout the entire construction. The plaintiff-general contractor prepared a total of eight change orders prior to October of 1970, but most of them were prepared subsequent to the changes having been made. At the request of the defendant Robert Lightner, plaintiff prepared a ninth change order in October of 1970, which admittedly amounted to an after-the-fact effort to allocate actual expenditures made, rather than any definitive specified changes and amounts incurred thereby. Defendant Robert Lightner testified that he did not prepare any written change orders because plaintiff's vice-president Walz advised him that plaintiff had change order forms and would do it for him. Plaintiff Walz testified that he did prepare change orders No. 1 and No. 2 in April of 1969, one of which made a change in the slip form, and the other of which deleted the electrical, mechanical, slip form, glazing and elevator contracts from plaintiff's contract and made those contractors prime contractors with the defendant-owner. He testified that he prepared change orders No. 3, 4, 5, 6, 7 and 8 at the

request of the defendant after said changes had already been made, and that he caused proposed change order No. 9 (Exhibit G-7) to be prepared at defendant Lightner's request in late summer of 1970, for something to justify actual construction costs. Plaintiff's project coordinator, Sigler, testified that he made changes in the construction without written change orders because he felt that he was obligated to when such changes were directed or approved by the defendant Lightner. The net result of this procedure, or lack [of] procedure, was that hundreds of changes were made during the actual construction without benefit of any written change order or other contemporary record.

"No. 8

"Plaintiff originally commenced this law suit on the theory that Exhibit No. 1, the contract, was in effect a cost-plus fixed fee contract. After the Court's previous interpretation of the contract, referred to in an earlier finding, both plaintiff and defendant were obliged to submit evidence to determine what changes and/or additions were made to the original work contemplated by the contract, and the net amount owing to plaintiff by defendant resulting therefrom—after allowing credit for deletions or omissions from the original work which resulted from some changes. Plaintiff offered evidence through the testimony and records of several of its subcontractors. In some instances the subcontractor did keep contemporary records of changes and additions. Plaintiff also prepared a 90 page book, admitted as Exhibit 17, which purported to show differences between the amounts expended on various items, as compared to the amount originally contemplated, in what was referred to in Exhibit 17 as 'base contract amount.' The defendant followed a different approach. It prepared Exhibit No. T, a 218 page book prepared by defendant's representatives going through the completed motel room-by-room, and itemizing changes in the finished construction from the original architectural plans and finish schedules, and allocating amounts for additions and deletions from the original contract price resulting from such known variations. The contents of both Exhibit 17 and Exhibit T were the subject of extensive testimony in the trial.

"No. 9

"After considering the testimony of all witnesses, and after studying the exhibits 17 and T, as well as other documentary evidence including the records of subcontractors, the Court finds that the best evidence of the changes and additions made to the original work and the net amounts owing therefrom by the defendant to plaintiff are as shown by Exhibit T, with three exceptions which will be dealt with in the succeeding findings."

The three areas where the court did not accept defendant's Exhibit T were in painting, dry wall and plastering, and structural steel. As to the first it found that the original contract called for painting in accordance with Hamman's original bid of $65,146. Later changes ordered or approved by Lightner ran the painting bill to $127,418.24. Plaintiff C. & W., it held, was entitled to recover the full difference of $62,272.

On the dry wall and plastering it found the contract originally

contemplated work covered by the subcontractor's bid of $97,353. When changes began to pile up the subcontractor demanded and received a new, cost-plus contract. The court found from circumstantial evidence that Lightner knew of and approved this modification. The total bill for this work was $289,393.86, and the court held that C. & W. would recover the full difference of $192,040.86.

As to the structural steel, and in particular the reinforcing steel known in the trade as "rebar," the court in No. 12 made what it referred to as "subfindings." Because they illustrate the careful consideration given by the trial court to the mass of complex and often contradictory testimony before it, we quote them in full:

"(a) Both the Supplemental Agreement of February 28, 1969, and the Supplemental Agreement of May 15, 1969, recite that at the date of execution of the contract, Exhibit 1, specific plans and specifications had not been finalized or determined to the extent that the contractor was able to make a firm bid for the construction.

"(b) As has heretofore been found by the Court, the architectural plans were completed prior to execution of No. 1 and were used by the plaintiff in preparing his take-off and bid.

"(c) The structural plans, as opposed to the architectural plans, were not completed as of the date of the execution of No. 1, and were in fact not completed until after the date of the second Supplemental Contract, May 15, 1969, as shown by the testimony of William Keltner of Professional Engineering Consultants, the structural architect designated in No. 1, whose testimony in this regard was corroborated by that of George Christopher, the steel supplier.

"(d) At the time of the execution of No. 1 the structural plans did not include the top three floors of the building, nor the roof and some other areas. At the time the existing plans indicated to Christopher and to one Dick Hartwell, an engineer at PEC who was working on the plans, a need for some one thousand tons of reinforcing steel.

"(e) Christopher signed a contract (Exhibit 2) with the defendant on November 25, 1968, to supply the steel for the construction of this hotel, but due to the incomplete structural plans Exhibit 2 amounted only to a unit price contract since the quantity involved could not be determined. Christopher did supply the steel on this project and had no further written contracts.

"(f) At the time of the execution of No. 1, and shortly prior thereto, both plaintiff's Walz and defendant's Lightner, and defendant Lightner himself, were advised by Christopher and by Keltner and Hartwell of PEC that there would be more steel needed in the construction than was shown on then existing plans. Keltner testified that he had made a 'qualified' and 'not-detailed' estimate that an average of 1300 tons would be required plus an additional amount that he didn't have sufficient information to even estimate. Christopher estimated that 1350 tons would allow a 50 ton cushion, but would only bid on unit price with the quantities to be determined as the plans were completed.

"(g) At the time of the execution of No. 1, both plaintiff and defendant

were well aware that completed structural plans would show the need for additional rebar steel. They were at that time attempting to reduce plaintiff's bid to an amount acceptable to defendant in order to commence construction, and in making his reduced bid plaintiff allowed for only the 1,007 tons of rebar then disclosed. As the structural plans were completed and the building was constructed it eventually required a total of 1607-and-one-fourth tons of rebar steel.

"(h) Notwithstanding defendant's position that plaintiff could estimate steel requirements from the architectural plans, it was the testimony of both the steel supplier, Christopher, and the structural architects, PEC, and the Court finds it to be true, that it was not possible to accurately estimate reinforcing steel needs from architectural plans.

"(i) In view of the completed architectural plans, and the incomplete structural plans, if the reference in the supplemental agreements to incompleted plans and specifications are to be accorded any significance or meaning, they must be interpreted to make reference to the incomplete nature of the structural plans at the time of the execution of the contract.

"(j) The additional cost to plaintiff for reinforcing steel over and above the amount known at the time of the execution of the contract was $53,347."

The court therefore permitted C. & W. to recover the extra $53,347.

The judgment rendered was for the three specific increases described above, less amounts previously paid, or a net of $142,045.86; interest (on the liquidated portion of the judgment) in the amount of $14,891.14; and for all other changes reflected in Exhibit T in the amount of $79,255.91. The total judgment in favor of C. & W. was for $236,192.91, which was promptly paid.

C. & W. filed a motion for a new trial and one to amend the findings, for additional findings, and to amend the judgment. In these motions it essentially urged once again that the trial court should find the dealings of the parties had converted the agreement into a simple cost-plus contract, with no guaranteed maximum. The court overruled both motions and plaintiff C. & W. appeals.

As its first and primary point on appeal C. & W. urges that when the project manager Lightner order countless changes without requiring written change ordered, and when Motel paid its first fourteen billings without question, C. & W. was justified in assuming that all costs would be paid without regard to the guaranteed maximum stipulated in the written contract. This conduct, it argues, constituted a waiver or tacit modification of the written contract, and estops Motel from asserting the writing as a defense.

In support of its position C. & W. relies on cases typified by *Bailey v. Norton,* 178 Kan. 104, 283 P. 2d 400. There a house was to be built for a maximum cost of $36,500.00, plus the contractor's

fee of 10% of the actual cost. The contract required that "major" changes be agreed upon in writing. The owner made oral changes, and agreed to pay for them, which added $11,779.96 to the cost. It was held that the contractor could include the additional cost in computing his fee even though the changes were not in writing, the court quoting with approval from *Hill v. Maxwell*, 71 Kan. 72, 75, 79 Pac. 1088:

" 'It is well settled, that the terms of a written contract cannot be varied by any previously executed contract, written or parol, nor by any contemporaneous parol contract. It is equally well settled, that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside, by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.' (*Todd v. Allen*, 18 Kan. 543, 545. See, also, 29 A. & E. Encycl. of L. 829.)"

That rule was followed recently in *Steffek v. Wichers*, 211 Kan. 342, 507 P. 2d 274, where we held that an owner who ignored the contract's requirement of the architect's approval of work during construction, and who moved into the building without securing the architect's final inspection certificate, thereby waived the contractual provision making such a certificate a condition precedent to final payment of the contract price. Since the owner had consistently ignored the architect, the contractor could maintain a suit for the balance due on the contract despite the absence of a final inspection certificate.

Similar reasoning was employed in *Owens v. City of Bartlett*, 215 Kan. 840, 528 P. 2d 1235, where we held the city had waived the requirement (in a water line contract) that change orders be in writing by ordering extra rock excavation and authorizing the rental of special equipment to do the work. This conformed to the parties' consistent conduct whereby they, "throughout the performance of the contract, entirely disregarded the stipulation [that changes be in writing]." (Id., p. 845.) The city was liable, we said, for the extra work it had ordered and promised to pay for.

These cases, however, do not help plaintiff here. It may well be that Motel waived the requirement that changed orders be in writing. If so, it would be liable for any excess costs occasioned by any change it had ordered, despite the lack of a written change order. As we see it, that is exactly what the trial court held. Despite the lack of written change orders it held Motel liable for net increases over the guaranteed maximum cost in the amount of $386,915.77.

What the trial court repeatedly refused to find was an implied waiver of the guaranteed maximum cost. It first found that there was such a maximum when it considered the declaratory judgment action on September 8, 1971. Considering the documents alone that decision was clearly correct, and the parties were bound by the contract unless there was a subsequent waiver. The court reconsidered the question and reaffirmed its decision in its mid-trial substitute for a pretrial order on October 1. By then it had heard four days of plaintiff's evidence, in which all of plaintiff's primary witnesses had testified and the dealings of the parties had been described at length. Plaintiff's position and its evidence on waiver had become abundantly clear. In making the October 1 order the court recited that it had considered "the documentary evidence and the oral testimony adduced thus far in the case." Later, at the conclusion of the trial, C. & W. specifically requested findings on waiver, and still later its waiver argument was made once more in its posttrial motions. Each time the trial court rejected the idea of waiver and found that the writing controlled.

On appeal we cannot reweigh the evidence, particularly in the face of the trial court's negative finding that plaintiff did not sustain its burden of proof on this issue. *Union National Bank & Trust Co. v. Acker,* 213 Kan. 491, 516 P. 2d 999; *Short v. Sunflower Plastic Pipe, Inc.,* 210 Kan. 68, 500 P. 2d 39. There was no undisputed evidence of waiver which the trial court ignored. Motel's position throughout was that it was perfectly willing to pay any extra costs resulting from changes it ordered, but expected the basic job to be done within the guaranteed maximum.

C. & W. is a large corporation, operated by experienced and sophisticated businessmen. It was dealing in large sums of money and had twice guaranteed its maximum cost in writing. The trial court may well have reasoned that if C. & W. really thought there was to be a new cost-plus contract to supersede the old one—one with no guaranteed maximum—it would at least have reached a clear and definite *oral* understanding to that effect. The plastering subcontractor, when its costs began to mount, had secured a new contract in writing. There is no testimony that C. & W.'s agents ever even discussed a new contract or a modification of the old one with anyone. There is certainly no evidence of a specific promise by Motel to pay all costs. We cannot say that on this record the trial court was bound to find a waiver.

We hold that the trial court did not err in finding that the written guaranteed maximum cost was binding, subject to adjustment for changes and additions ordered by the owner.

In its second point C. & W. argues that, assuming the trial court's construction of the contract was correct, it nevertheless erred in computing the amount of the judgment for the three areas of painting, dry wall and plastering, and structural steel. It points to alleged discrepancies between various bits of testimony and the final amount reached by the court. It says the court did not consider, for example, such items as: indirect labor costs, based on a claimed industry standard of 15% of the actual cost; costs for rescheduling the elevator; increased performance bond premiums; waste disposal; fringe benefits to the union; and additional security.

As to all such matters we are bound by the principle that "It is not the function of appellate courts to make an independent accounting of formidable accounts in order to determine the precise correctness of particular findings." ( *Smith v. Derby Oil Co.*, 147 Kan. 300, 76 P. 2d 846, Syl. ¶ 1. See also, *Allen County Comm'rs v. Board of Education*, 142 Kan. 770, 772, 51 P. 2d 973; *City of Oswego v. Condon*, 124 Kan. 823, 262 Pac. 542.) This court will disturb the trial court's findings of fact on such an account only where "manifest or demonstrable error appears." ( *Smith v. Derby Oil Co.*, supra.) Any errors in this accounting are at best debatable and cannot be said to be "manifest or demonstrable."

In particular C. & W. complains that it was docked for steel not used when two of the four roof-top signs shown in the architectural drawings were not erected. Despite such drawings it says the original bids called for no signs at all, and it should have had an addition for the two it built rather than a deduction for the two not built. This issue, like the other matters raised under this point, was a factual matter to be determined by the trial court. It did so on conflicting evidence, and we cannot upset its findings on appeal.

C. & W.'s third point on appeal is that, again assuming the court correctly construed the contract, it erred in using defendant's Exhibit T as a basis for its judgment. That exhibit, as noted in finding No. 8 quoted above, was a room-by-room comparison of the completed motel with the original architectural plans and finish schedules, allocating amounts for additions and deletions from the original contract price. On this issue plaintiff offered, instead, its own

exhibit 17. The trial court found from all the evidence that, with the three exceptions described above, Exhibit T was "the best evidence of the changes and additions made to the original work and the net amounts owing therefrom by the defendant to plaintiff." (Finding No. 9, *supra.*)

C. & W.'s first objection to Exhibit T is that it represents the opinion of Lightner, who, it contends, was not qualified to render one. Whether he was qualified or not was a matter for the trial court's discretion. *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 507 P. 2d 288; *Avey v. St. Francis Hospital & School of Nursing*, 201 Kan. 687, 442 P. 2d 1013. Although Lightner had never before been involved in a high-rise motel, he did have twenty-five years' experience in the construction business. We cannot say there was an abuse of discretion in receiving his opinion by admitting Exhibit T into evidence.

The second and more substantial objection to Exhibit T goes to its accuracy. C. & W. challenges its sufficiency as "substantial competent evidence" on which to base a judgment. The difficulty with this argument is that in the absence of Exhibit T there would be no reliable evidence at all of the cost of changes except in the three special areas of painting, dry wall and plaster, and structural steel. Plaintiff started out relying on its ninth proposed change order which "admittedly amounted to an after-the-fact effort to allocate actual expenditures made, rather than any definitive specified changes and amounts incurred thereby." (Finding No. 7, *supra.*) It was just "something to justify actual construction costs." (Ibid.) When the October 1 order was entered it became apparent that the trial court felt that "both plaintiff and defendant were obliged to submit evidence to determine what changes and/or additions were made to the original work contemplated by the contract, and the net amount owing to plaintiff by defendant resulting therefrom." (Finding No. 8, *supra.*) C. & W. then prepared its Exhibit 17. It soon developed, however, that Exhibit 17 was but a restatement of change order No. 9, *i. e.,* it also was the result of taking the total costs incurred and working backward to spread them over work done. Like change order No. 9, it could in no sense be said to reflect any actual relationship between the various changes ordered and specific cost increases. There was, therefore, ample justification for the court's finding that Exhibit T was the "best evidence" of the changes ordered and their effect on costs. Even then the court did not accept it at full face value; it relied

on better evidence where it was available in the three areas discussed above. In the absence of anything better the trial court was justified in basing its determination of additional costs, at least in part, on Exhibit T.

The final point on appeal is that the court should have sustained C. & W.'s posttrial motions for the reasons previously urged. From what has been said it is apparent there was no error in this ruling.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME and PRAGER, JJ., not participating.