877 P.2d 928

**BOUTEN CONSTRUCTION COMPANY, Plaintiff–Appellant–Cross Respondent,**

v.

**M & L LAND COMPANY, an Idaho corporation, Defendant–Respondent–Cross Appellant,**

and

**The Wallace Inn, Inc., an Idaho corporation; H.F. Magnuson Company, an Idaho corporation; Defendants–Respondents.**

No. 19564.

Court of Appeals of Idaho.

July 13, 1994.

McCormick, Dunn & Black, Coeur d'Alene, for appellant. Joel C. McCormick, III, argued.

Evans, Keane, Koontz, Boyd, Simko & Ripley, Kellogg, for respondents, M & L Land Co., The Wallace Inn, Inc., H.F. Magnuson Co. Fred M. Gibler, argued.

SWANSTROM, Judge Pro Tem.

This case involves a dispute between property owners and a contractor over the construction of a restaurant and motel in Wallace, Idaho. Bouten Construction Company, of Spokane, Washington (hereinafter "BCC"), is the contractor. M & L Land Company ("M & L") owned the land where the dual project was built. H.F. Magnuson Company (hereinafter "Magnuson") owns the motel, the Wallace Inn. A third company owns the restaurant, and alleged disputes regarding construction of that facility were settled before trial. BCC completed the work on the Wallace Inn, but its costs exceeded the amount BCC received from the owners. BCC brought actions for breach of contract and lien foreclosure in district court against Magnuson for money BCC claimed was due for building the Wallace Inn and against M & L for site work BCC had performed in conjunction with the Wallace Inn and the restaurant project. Several subcontractors who had filed liens against the Wallace Inn prevailed in this action below, but they are not parties to this appeal.

The district court granted judgment in favor of BCC against M & L and against Magnuson. The court also awarded costs and fees in favor of Magnuson and M & L against BCC for defense of the subcontractors' lien claims under I.C. § 45–511. On other claims, the court apportioned attorney fees and costs among the parties according to the extent each prevailed upon the claims.

### ISSUES

BCC only recovered about eight percent of its claims against Magnuson and BCC appeals. Broadly stated, BCC contends that the district court erred in finding that the parties' contract contained a guaranteed maximum price which limited the amount of construction costs recoverable by BCC. BCC also contends that the court erred in making BCC, rather than Magnuson, liable under I.C. § 45–511 for payment of all attorney fees and costs connected with the foreclosure of the subcontractors' liens. Moreover, BCC contends the statute is unconstitutionally vague. Finally, BCC contends that the court did not award adequate attorney fees for the claims on which BCC prevailed.

M & L cross-appeals contending that the court should not have awarded BCC additional money for the site work because BCC failed to prove that its claimed costs for such work were reasonable.

We affirm the judgment in part, vacate in part and remand the case for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY AND FACTS

On June 17, 1988, Magnuson and BCC signed a contract for the construction of the Wallace Inn on the site owned by M & L. In the contract, BCC agreed to construct the Wallace Inn on a "cost plus" basis with a "Guaranteed Maximum Price" (GMP). When signed, the contract did not recite the amount of the GMP although the contract stated how the GMP would be established by the parties, and if they could not agree upon the amount of the GMP, "this entire Agreement becomes null and void." The parties discussed figures supplied by BCC comprising its estimated costs for the work but no GMP was agreed upon on June 17. However, on June 20, BCC sent a letter to Magnuson indicating BCC's willingness to commit to a "Guaranteed Maximum Price" of $1,790,-643.

The $1,790,643 GMP was BCC's estimated total cost to build the Wallace Inn, plus its fee. In preparing its estimate, BCC relied upon the preliminary drawings of Magnuson's architect; these were not the detailed plans and specifications necessary to construct the project. BCC also relied upon its forty years of experience in the construction business and upon other information it had gathered about the project. BCC's owner, Frank Bouten (hereinafter "Bouten"), had met with the architect on several occasions to obtain information and details about the project. The architect led Bouten to believe that the quality level of the project would be comparable to the "Best Western" motel-chain standards. Bouten was generally familiar with these standards because at the time BCC was completing remodeling work on a Best Western motel in the area. In addition, BCC contacted numerous suppliers and potential subcontractors to obtain their estimates of costs of materials and work which they might be asked to provide if BCC was given the job by Magnuson. Thus, BCC

entered into a written "cost plus" contract with Magnuson containing a guaranteed maximum price of $1,790,643.[1]

As the district court found, three documents comprised the parties' contract to build the Wallace Inn: the "Standard Form of Agreement Between Owner and Contractor," signed on June 17, 1988; "General Conditions of the Contract for Construction;" and the letter written by Bouten to Magnuson on June 20, agreeing to a $1,790,643 GMP. We will generally refer to the three documents as "the contract." Bouten prepared the first document on a standard AIA printed form containing the following provisions. The language in **bold type** Bouten added to the form before it was signed.

5.2.1 The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed _____ Dollars ($_____), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner.

**A Guaranteed Maximum Price will be established as soon as design development drawings are complete. Any savings will be reverted in full to the owner.**

**5.2.1A The Guaranteed Maximum Price may be adjusted up to five percent (5%) based upon final contract documents being furnished by the Architect. If changes are greater than a five percent (5%) add, then the scope of work will be negotiated downward to a mutually agreeable Guaranteed Maximum Price with changes directed by the Owner.**

5.2.2 The Guaranteed Maximum Price is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner.

---

1. Following trial, the district court found that BCC's total direct cost of the Wallace Inn project was the sum of $2,358,944.62.

[Here, in small italicized type, the printed form had these instructions:]

*(State the numbers or other identification of accepted alternates, but only if a Guaranteed Maximum Price is inserted in Subparagraph 5.2.1. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date until which that amount is valid.)*

[In the space below this instruction, Bouten inserted:]

**A Guaranteed Maximum Price will be provided by the Contractor after completion of the design and development documents and then become a part of this Agreement. The Contractor's fee will be included in the Guaranteed Maximum Price.**

**If the Owner and Contractor do not agree upon a Guaranteed Maximum Price, this entire Agreement becomes null and void.**

**If a contingency amount is included in the Guaranteed Maximum Price, it will be used for changes approved by the Owner. Any unused amount of the contingency will be returned in full to the Owner.**

In a subsequent Article, the contract categorized the costs which the contractor could recover for performing the work. It also enumerated expenses of the contractor which would not be considered "costs". In this category the contract—as modified by Bouten—recited:

8.1 The Cost of the Work shall not include:

. . . .

8.1.8 Costs which would cause the Guaranteed Maximum Price, if any, to be exceeded, **except where changes required by the Owner occur that add to the Guaranteed Maximum Price and any costs necessitated by City, State, or Federal requirements not incorporated in the working drawings and specifications at the time the Guaranteed Maximum Price is established.**

I.

# DOES THE EVIDENCE SUPPORT THE TRIAL COURT'S FINDINGS THAT THE PARTIES AGREED TO A COST PLUS CONTRACT WITH A GMP OF $1,790,643?

BCC contends that the district court erred in finding that the parties initially agreed to a "cost plus" contract with a GMP of $1,790,-643. BCC further contends that the court misconstrued the contract language dealing with establishment of a GMP and that the court ignored certain language which is critical to carrying out the intent of the parties. BCC argues that the language must be read in the context of the circumstances existing when the contract was signed on June 17, 1988, and the circumstances which both parties contemplated would follow in the course of events. We will address these arguments in turn.

## A. The "Initial" Guaranteed Maximum Price

■ It is undisputed that the design of the Wallace Inn was far from complete when the contract was signed on June 17, 1988. Magnuson's architect for this project had produced "design development drawings" but these did not contain the structural, mechanical and electrical details necessary to build the project or to obtain subcontractor bids. Nevertheless, it is clear that BCC and Magnuson were willing to begin construction on a "fast track" basis even before the plans were complete. The parties expected that the architect would produce detailed plans and specifications necessary for subcontractor bids by July 15 and that he would provide other necessary drawings and specifications before they were needed in the course of construction. These expectations were soon dashed by delays and changes in the design, but Bouten had already issued a letter to Magnuson, dated June 20, 1988, offered as an amendment to the contract, reciting that the "Guaranteed Maximum Price is hereby established as [sic] $1,790,643.00. This number fulfills Article 5.2.1." The letter ended with a request that Magnuson indicate its approv-

al by signing and returning a copy of the letter.

BCC first contends that Magnuson never indicated acceptance of its "offer" to establish the GMP at $1,790,643; therefore, the parties either proceeded on a "cost plus contract" without any GMP or else proceeded without any valid written contract because, by its own terms, the contract would be "null and void" if the parties were unable to agree upon a GMP, as stated in Article 5.2.2 of the contract.

The district court was not persuaded by this argument. A copy of BCC's June 20th letter with Magnuson's signature indicating approval of a $1,790,643 GMP was admitted in evidence, although Bouten denied that BCC had received such a copy until after this litigation started. Nevertheless, the district court found that Magnuson and BCC went forward on the project with the initial understanding and agreement that BCC's costs plus a fee to build the Wallace Inn would not exceed $1,790,643. Because we find substantial, although disputed, evidence in the record to support these findings, we will uphold them. I.R.C.P. 52(a); *Stout v. Westover,* 106 Idaho 533, 534, 681 P.2d 1008, 1009 (1984).

## B. The "Final" Guaranteed Maximum Price

BCC argues that even if the parties initially agreed to a GMP of $1,790,643, this figure was subject to renegotiation when the "final contract documents" were prepared by the architect and furnished to the owner and the contractor. BCC relies in part upon Article 5.2.1A which Bouten had drafted into the contract. That article reads as follows:

**The Guaranteed Maximum Price may be adjusted up to five percent (5%) based upon *final contract documents* being furnished by the Architect. If changes are greater than a five percent (5%) add, then the scope of work will be negotiated downward to a mutually agreeable Guaranteed Maximum Price with changes directed by the Owner. [Emphasis added.]**

2. The architect was not made a party in this action, nor did he testify in person as a witness

BCC also relies upon the language Bouten had inserted in Article 16 of the contract, where all of the "contract documents" were to be listed or referred to. However, because most of the contract documents, consisting of detailed construction plans, specifications and the like, were not yet produced when the contract was prepared and signed, specific documents could not be listed. Therefore, in lieu of listing documents, Bouten inserted the following general language in each of the Articles 16.1.3 through 16.1.6.

**The final working drawings and project manual from which the Guaranteed Maximum Price is established will be added by an Amendment to the Agreement when they are finalized.**

As noted earlier, the owner and the contractor contemplated when they signed the contract that the architect would substantially complete the "final contract documents" by July 15, 1988. The overwhelming weight of the evidence at trial showed, however, that the architect failed to meet the design expectations of the owner and contractor.[2] Moreover, Magnuson directed that various changes be made in the design as work progressed. BCC did not receive "final contract documents" or even necessary interim designs when they were needed. For example, the district court found:

16. BCC's agent, MORRISON, continually complained to the agents of [the owner] about the lack of detailed drawings, final drawings and a lack of detailed specifications. These complaints were made at various times to MAGNUSON [the owner], KIMBERLING [the owner's project manager] and BARNARD [the owner's architect]. BCC each time continued with the project in an attempt to meet the projected completion date of May 15, 1989.

. . . .

25. A substantial factor in the increase in the cost of the WALLACE INN was the failure of BARNARD to provide timely and complete final drawings, specifications and details.

at trial although portions of his deposition were introduced as evidence.

26. [The owner] during the course of construction continued to amplify and refine the plans and specifications for the project.

BCC argues that the failure of the owner and its agent to furnish final drawings and specifications in a timely manner deprived BCC of the opportunity to exercise its right under Article 5.2.1A to renegotiate the GMP at a time when the overall cost of the project could be determined and contained.

The district court did not discuss or mention Article 5.2.1A in its decision. To compound the injury, BCC argues, the court found BCC at fault for not timely following contract procedures for increasing the GMP. These contentions deserve discussion and we will return to them later. First, we will discuss the following findings made by the district court which also relate to the GMP.

10. The Standard Form of Agreement Between Owner and Contractor dated June 17, 1988 (Trial Exhibit 6A) as prepared by BCC contained two inconsistent provisions concerning when the guaranteed maximum price would be established. Those provisions are:

Article 5.2.1—* * * A Guaranteed Maximum Price will be established as soon as design development drawings are complete * * *

and

Article 16.1.3 through 16.1.6—The final working drawings and project manual from which the Guaranteed Maximum Price is established will be added by an Amendment to the Agreement when they are finalized.

11. BCC chose to establish the guaranteed maximum price based upon the completed design development drawings as provided by Article 5.2.1 of the Standard Form of Agreement dated June 17, 1988 Trial (Exhibit 6A).

## C. Are the GMP provisions of the contract ambiguous?

BCC contends that because the district court found Articles 5.2.1 and 16.1.3 "inconsistent," the contract must be ambiguous, and the district court erred in refusing to allow BCC to introduce parol evidence of the par-

ties' intent as to these contract provisions for establishing the GMP.

Preliminarily, we note that whether the contract language is ambiguous is a question of law over which appellate courts have free review. *Rath v. Managed Health Network, Inc.*, 123 Idaho 30, 31, 844 P.2d 12, 13 (1992). Where the contract is unambiguous and clear, the determination of the contract's meaning and legal effect are questions of law which we may decide. *Id.* We will discuss these disputed contract provisions.

The first provision, Article 5.2.1, declares that a GMP will be established "as soon as design development drawings are complete." Under this provision, BCC could have declined to agree to any GMP until those drawings were complete. As the district court found, however, on June 20, 1988, BCC "chose" to establish the GMP based on the existing design development drawings. In agreeing to an initial GMP of $1,790,643, BCC evidently relied upon its significant experience in the construction business and upon information extraneous to the existing design development drawings. BCC knew that the preliminary design drawings from which BCC had estimated its costs of construction could be changed by the owner and architect before the working drawings and specifications were complete. To provide for this contingency, BCC added Article 5.2.1A to the contract. This Article clearly allows for an adjustment to the GMP at an anticipated early date during the course of construction, when the GMP could be "adjusted up to five percent (5%) based upon final contract documents being furnished by the Architect." The Article recited further that "[i]f changes are greater than a five percent (5%) add, then the scope of work will be negotiated downward to a mutually agreeable Guaranteed Maximum Price with changes directed by the Owner."

While the contract itself makes it clear that the final contract documents were not finished or complete, other undisputed evidence shows that the parties expected the architect to have these documents ready in July, 1988. Article 5.2.1A obviously refers to a time early in the course of construction

when "the scope of the work," as envisioned in the final design, could be negotiated downward if necessary. The critical word in Article 5.1.2A, however, is the word "changes." In the context of this agreement, the word "changes" can only mean a change in the work from what was required to be done by the contractor in building the Wallace Inn as originally designed, or a change in the quality of the materials, equipment and finishes which were to be furnished by the contractor for the work it originally agreed to do. Articles 5.2.1 and 5.2.1A are not inconsistent.

The district court found "inconsistent" language in Article 16 of the contract where all of the "contract documents" were to be enumerated. As noted earlier, because Bouten could not list or refer to specific documents not yet prepared, he inserted the following general language:

> **The final working drawings and project manual from which the Guaranteed Maximum Price is established will be added by an Amendment to the Agreement when they are finalized.**

Relying on this language, Bouten testified that it was the intention of the parties to establish an "initial" GMP when the "design development drawings" were complete, but that they also intended to establish a "final" GMP when the "final working drawings" and other contract documents were complete. Although the district court found the above clause to be inconsistent with Article 5.2.1, the court did not accept Bouten's view that the parties had not "established" the GMP before construction began.

BCC places too much emphasis on the word "established" as used in Article 16, where the purpose of the Article was simply to list or refer to contract documents, not to address how or when the GMP would be established. Under Article 5.2.1A, the GMP could be "adjusted" up to five percent "upon final contract documents being furnished by the Architect." However, that adjustment was contingent upon "changes" that might be made in the design and specifications after BCC's agreement to the initial GMP.

From the beginning, the parties contemplated that changes and additions would be made to the initial design of the Wallace Inn.

This is shown by the contract itself and by undisputed evidence admitted at trial. Because some changes affecting the GMP could be made at any time throughout the course of construction, the "final" GMP would not be known until the job was complete. In this sense, the GMP might not be finally "established" until the job was finished. Neither could there be a complete list of contract documents until all cost-worthy changes were known. Nevertheless, we conclude that the contract is not ambiguous as to what design information is to be utilized to establish the GMP initially and to determine or "establish" finally what the GMP will be when all adjustments to it have been made.

The contract spelled out specifically how the contractor was to seek recovery for extra costs caused by changes and additions to the work. Unless the changes resulted in greater costs to BCC than it had under the initial design, BCC would not be entitled to any increase in the GMP. At trial, BCC had the burden to show that "changes" were made, that the changes increased the costs, and the amount of the increase caused by the changes.

## II.

### DID MAGNUSON WAIVE THE GMP PROVISIONS OF THE CONTRACT?

Bouten contends that because Magnuson refused to reduce the scope of the work when the projected costs became known, and refused to negotiate a new final GMP, the initial GMP of $1,790,643 was waived or abandoned. Bouten testified that the parties nevertheless pushed ahead with the project, believing that it was then on a "cost plus a fee" basis without any effective GMP. The district court was not persuaded that either of the parties believed the GMP provisions no longer applied to the parties' contract. The district court made the following findings.

168. While there were differences of opinion between BCC and [Magnuson] concerning the costs of the WALLACE INN project, there was no intentional abandon-

ment of the guaranteed maximum price contract.

169. Except in the specific instances noted previously in these findings, BCC made no attempt to formally modify the guaranteed maximum price until the submission on May 1, 1989 of the requests for authorization. . . .

170. Except as specifically noted previously in these findings, [Magnuson] did not waive compliance with the terms and conditions of the guaranteed maximum price contract.

■■■ The district court was faced with conflicting evidence on the question of whether the GMP provisions of the contract were waived or modified. Where, as here, the evidence is disputed or conflicting, the question initially is one of fact to be determined by the trier of the facts. *Resource Engineering, Inc. v. Siler*, 94 Idaho 935, 938, 500 P.2d 836, 839 (1972). The party asserting that provisions of a written contract were subsequently waived or modified by oral agreement or by conduct of the parties has the burden of proving the assertion by "clear and convincing" evidence. *Id.*

In *County of Canyon v. Wilkerson*, 123 Idaho 377, 848 P.2d 435 (Ct.App.1993), we held:

> Where the lower court reaches a determination that is contrary to the claim alleged by a party, based on the evidence presented on both sides of the issue, the court effectively decides that the evidence is insufficient to support that party's contention. In *Viehweg v. Thompson*, 103 Idaho 265, 647 P.2d 311 (Ct.App.1982), we characterized this as a "negative" finding, i.e., that a party has failed in its burden of proof. On appeal, the appellate court's standard for review of such a finding is to determine if the lower court's decision is "clearly erroneous."
>
> Under the restrained standard of clear error customarily applied to factual issues, a factual finding will not be deemed clearly erroneous unless, after reviewing the entire record, an appellate court is left with a

definite and firm conviction that a mistake has been made. Finally, clear error will not be deemed to exist if the findings are supported by substantial and competent, though conflicting, evidence. On appellate consideration, we defer to the district court's special *opportunity to determine the credibility of the witnesses who have testified.* . . .

123 Idaho at 381–82, 848 P.2d at 439–40 (citations omitted). Applying these standards, we hold that finding no. 168 is supported by substantial evidence and, although the evidence is disputed, this finding will be upheld.[3] The parties did not intentionally abandon the GMP feature of the contract. The latter two findings are more difficult to deal with.

### III.

### DID THE DISTRICT COURT ERR IN FINDING THAT BCC DID NOT TIMELY SEEK ADJUSTMENTS TO THE GMP?

The questions next to be answered are whether BCC sought timely "adjustments" to the GMP, whether the parties, specifically Magnuson, waived procedures set out in the contract for making change orders, and whether BCC established at trial what additional costs it incurred for changes made by Magnuson and his architect during the course of construction.

The district court held that BCC did not timely seek adjustments in the GMP, and when it did the project was too far along to allow Magnuson to reduce the scope of the project or make other changes in the work so as to keep the costs within the GMP. Moreover, the district court held that BCC did not follow the contract procedures for seeking upward adjustments to the GMP.

BCC contends that the district court erred, for the following reasons. As we noted earlier, BCC argues that it was prevented from making a seasonable request for adjustment of the GMP under Article 5.2.1A by the failure of Magnuson and its architect to timely complete the final drawings, plans and

---

3. *Compare, Liebelt v. Liebelt,* 125 Idaho 302, 870 P.2d 9 (Ct.App.1994) (upholding trial court's finding of abandonment of agreement by parties, where supported by substantial evidence).

specifications. Nevertheless, BCC argues, Magnuson was kept fully aware that changes to the plans were driving up the price, while at the same time Magnuson refused to reduce the scope of the work or to negotiate a new GMP. Finally, as a separate but related issue, BCC contends that the district court erred in faulting BCC for not following the contract "change order" procedures when, on the other hand, Magnuson ignored or waived contract requirements for written change orders.

■ In part, BCC returns to the argument that when the architect completed the final contract documents, so that "firm pricing" could be obtained from subcontractor bids, the "final" GMP would be established. However, this is not the way we read the contract; it calls for "adjustments" to the GMP, and the adjustments are to be the result of "changes" in the design or scope of the work which increase the cost of the work to the contractor. The word "changes" appears in Articles 5.2.1A and 8.1.8. Absent from the contract is any clear language giving the contractor the right to have the GMP reestablished solely because one or more of the subcontractor bids exceeded the estimates originally provided to BCC. *See, e.g., Modern Builders, Inc. of Tacoma v. Manke,* 27 Wash.App. 86, 615 P.2d 1332 (1980). What BCC needed to prove, but did not, was that the increased bids were caused by changes Magnuson or the architect made in the work. Unfortunately for BCC, proving changes was made more difficult by the lack of detail in the design development drawings upon which BCC relied to establish the GMP initially.

## IV.

### MODIFICATION OF THE CONTRACT'S "CHANGE ORDER" PROCEDURE

■ The contract was explicit about how changes in the work were to be documented and handled by the owner, the contractor and the architect. The cost consequences, if any, of a proposed change in the work were to be determined and agreed to by the contractor and owner before the change was actually made. The contract placed the responsibility on the architect for preparing "change orders" which, when agreed to, would be added to the "contract documents." From the beginning, however, these procedures generally were not followed. The question is whether the contractor, the owner, or both must bear the consequences of failing to follow the contract's provisions.

BCC's evidence showed that numerous changes and additions to the work were directed by the architect and the owner without compliance with the written "change order" procedure. For example, by oral agreement among Magnuson, BCC and other parties, the contract was modified on June 22, 1988, to give BCC certain site-preparation work in addition to the work included in the contract. It was understood that BCC would proceed with this site work strictly on a cost-plus basis. All applicable provisions of the written contract were to apply to this work, except the GMP limitations.

The architect's initial design called for a concrete block building, and BCC based its GMP upon that design. However, before work began, Magnuson decided to use brick veneer instead of block construction, after BCC provided an estimate of the additional cost for this change. Work then proceeded long before the architect completed all of the construction plans and details which this change would require. For example, undisputed evidence showed that BCC was bringing the roofs on two wings of the building together before the contractor was given complete plans for all of the structural supports then being designed for this juncture. At this time of the year, November 1988, it was essential to both Magnuson's and BCC's interests that the roof be completed without any delay in order to protect the building from severe winter weather and to enable the work to go forward throughout the winter. This was but one example where the procedure for change orders was not followed. Magnuson clearly knew, however, that the change to brick would result in an increase in the GMP and he never disputed his responsibility for an increased payment, although the parties could not agree on the amount of the increased costs to BCC for this work. The district court ultimately determined the additional cost to BCC of this

change, increased the GMP by this amount, and awarded the amount to BCC in the judgment.

Magnuson also initiated other changes while the work was in progress. In at least two instances, after work was already done by BCC in accordance with the construction plans, Magnuson had changes made which required the work to be redone in a different manner. Again, in each instance Magnuson acknowledged that he owed for the increase in cost for this additional work, although there was no request by BCC for a written change order as required by the contract. In these two instances and in one other instance involving the redesign of the roof above the swimming pool, the district court allowed additional costs to BCC, holding that Magnuson waived the requirement of a change order. Only in these instances did the district court find that Magnuson had waived "compliance with the terms and conditions of the guaranteed maximum price contract." *See* finding no. 170 above.

It should be noted here, however, that the change order procedure itself was altered at Magnuson's direction. The contract provided that the architect would prepare written change orders when one of the parties to the contract requested a change in the work or work in addition to that called for by the contract documents. Because work began and proceeded rapidly before the architect had completed construction plans and specifications, and the lack of such documents was seen to be an impediment to the progress of the work, Magnuson, on August 8, 1988, issued a directive that the architect would concentrate on producing the necessary construction documents and that he would no longer be responsible for preparing change orders. This alteration of procedure came a month after construction began. There is evidence that this alteration of the architect's duties was discussed by, and apparently agreed to by, the parties. It represents an oral modification of the contract provisions for the use of "change orders" to accomplish a change in the "contract sum" and in the GMP. There is no evidence that any substitute procedure was put in place for handling change orders. The trial judge made no

findings as to the effect this contract modification had upon BCC's failure to follow contract procedure to obtain an increase in the GMP. To the extent that finding no. 170 overlooks or disregards the oral modification of the change order procedure, it is erroneous.

In the face of undisputed evidence that Magnuson and his agents directed or authorized changes in numerous instances without the formality of a change order, and Magnuson modified the change order procedure set forth in the contract without any clear agreement as to how changes in the work were to be handled, we hold that the requirement of written change order should not be unilaterally enforced against BCC. This holding is consistent with the ruling of our Supreme Court in *Harrington v. McCarthy*, 91 Idaho 307, 420 P.2d 790 (1966), one of the few Idaho appellate decisions dealing with similar issues. *See also, Coonrod & Walz Constr. Co., Inc. v. Motel Enterprises, Inc.*, 217 Kan. 63, 535 P.2d 971 (1975).

In the trial court Magnuson argued that BCC's failure to timely submit change orders for approval denied the owner the opportunity to contain its costs at a time when significant savings could be made, before the project progressed too far. This "estoppel-type" argument is not persuasive. Magnuson and its agents on the job were kept apprised throughout the project that costs of construction were rising even though exact figures could not be determined. For example, Magnuson was informed when the subcontractor bids were received in August, 1988, that BCC's costs for specialty work would be higher than estimated. At that time Magnuson was told that BCC's costs to build the project, as then designed, would greatly exceed the $1,790,643 GMP. Of course, as we have already ruled, the contract did not give BCC any right to increase the GMP merely because the subcontractor bids were higher than BCC had estimated they would be. *Accord, Modern Builders, Inc. of Tacoma v. Manke*, 27 Wash.App. 86, 615 P.2d 1332 (1980). However, as soon as the bids were received, it became obvious to both parties that BCC's costs were going to be above the GMP so that *any* delays or changes which

added to the costs of construction would increase the GMP above $1,790,643.

Even before August, Magnuson knew that substituting brick veneer for block construction would increase the GMP. Magnuson was aware, when it later requested other changes—some of which required undoing work already done—that the changes would further increase the project costs and, more importantly, the GMP. It is disingenuous for Magnuson to argue that it was misled by BCC's continued use of the $1,790,643 "contract sum" figure on its periodic applications for payment. Before Magnuson received the first application for payment, Magnuson knew that the GMP had increased by the additional costs associated with changes of the work. On the other hand, the evidence shows that Magnuson approved of only a few relatively minor cost-saving changes to offset the escalating costs of construction.

In summary, we hold that BCC was not at fault in failing to timely follow the change order procedures set forth in the contract. Under the evidence in this case, we hold that no valid reason was shown for denying BCC the right to prove at trial that its total reasonable costs of constructing the motel were increased as a result of changes in the work, changes in the quality of the materials, equipment and finishes that were to be provided by BCC according to the understanding and agreement of the parties when the GMP was established at $1,790,643.

BCC contends that the court erred in finding that BCC made no attempt to "formally modify" the GMP until May 1, 1989. Because of our ruling above, we believe that this finding is not germane to our decision and, therefore, we need not discuss this related issue.

Our holding does not alter BCC's burden to prove each change that it contends was made in the original design and specifications which resulted in increasing BCC's construction costs. At trial, BCC not only had the burden of proving that a particular change was made, but it also had the burden of proving that the change was more costly, and it had to prove the amount of such increased cost and that the amount was reasonable.

*See generally, Modern Builders, Inc. of Tacoma v. Manke, supra.*

It is not clear from the trial record whether BCC was permitted to fully meet its burden of proof. The trial court may have denied BCC some relief on its claims because no timely "change orders" were submitted, or because Magnuson only "waived" the requirement of change orders in certain instances. The trial court's findings of fact and conclusions of law, although extensive and well-prepared, discuss only certain of BCC's list of changes. While the court explained why BCC was allowed additional costs for some of the claimed changes, it is not exactly clear why the court denied relief of the remainder. If BCC was prevented by rulings of the court from proving the increased costs made necessary by other changes for which no change order was submitted to Magnuson, then the trial court on remand should reconsider its rulings in light of this opinion and reevaluate the evidence offered by BCC relative to the costs resulting from such changes. A new trial on the question of BCC's contract damage claims may not be necessary. Additional evidence on the question of BCC's increased costs need be taken only if BCC shows that it was prevented from meeting its burden of proof at trial. Otherwise, BCC's claim for additional costs may be decided upon the evidence previously offered at trial.

## V.

### I.C. § 45–511: DOES IT REQUIRE THE OWNER OR THE CONTRACTOR TO DEFEND AGAINST SUBCONTRACTOR CLAIMS OF LIEN? IS THE STATUTE UNCONSTITUTIONALLY VAGUE?

In ruling on summary judgment motions prior to trial, the district court held that under I.C. § 45–511 BCC, the contractor, had the obligation either to pay those subcontractors who claimed liens against the owners' property or the contractor would be liable for the cost incurred by the property owners in defending against the subcontractors' claims. In the action below, ten subcontractors who had not been fully paid for their

work pursued lien claims against the property owners. Eight of these were successful in proving valid claims of lien. Seven of the subcontractors who also made contract claims against BCC were successful on those claims.

Following trial, the court ruled that BCC was liable, by individual contracts and under I.C. § 12–120, for the costs and attorney fees of the subcontractors, and BCC was also held liable under I.C. § 45–511 for the costs and fees incurred by the property owners, Magnuson and M & L, in defending against the subcontractors' claims of lien. BCC contends that the district court erred in assessing these costs and fees against BCC, rather than against the property owners.

BCC argues first that the property owners should be liable for all of the claims of the subcontractors, including the costs and attorney fees of the subcontractors, because the property owners wrongfully withheld payment of the construction costs to BCC thereby causing BCC to default in its payments to the subcontractors.

Second, BCC contends that it gave notice to the property owners that the claims of the subcontractors were valid and reasonable claims for materials furnished and work performed in building the Wallace Inn, and that the claims ought to be paid or settled without incurring further litigation expense. Because the decision of the court following the trial unquestionably rejected all of the owners' defenses and claims in regard to the quality and cost of the subcontractors' work, BCC argues that the owners should bear the litigation costs associated with the prosecution and defense of the subcontractors' claims of lien.

Third, BCC asserts that I.C. § 45–511 is vague and ambiguous and the court should not have held that this statute imposed any duty upon BCC to provide and pay for the owners' defense of the subcontractors' claims of lien.

Fourth, BCC contends that I.C. § 45–511 is unconstitutional because it is so vague as applied to BCC in this situation that it results in a denial of BCC's due process rights. BCC's challenge to I.C. § 45–511 on constitutional grounds was not made in the trial court with citations of authority and argument focused on the constitutional issues now being asserted. Because the constitutional issue was not explicitly presented to the trial court and is being raised for the first time in the appeal we will not address it. *George W. Watkins Family v. Messenger,* 118 Idaho 537, 541, 797 P.2d 1385, 1389 (1990).

Idaho Code § 45–511 is a single 225–word sentence that requires careful scrutiny.[4] We hold that the district court did not err in ruling, at the summary judgment stage, that BCC had the duty to defend against the claims of the subcontractors. Although I.C. § 45–511 does not explicitly place this duty upon the contractor, that intent is implicit in the statutory scheme. Our Supreme Court has generally accepted this construction. *See, e.g., Acoustic Specialties, Inc. v. Wright,* 103 Idaho 595, 651 P.2d 529 (1982).

Factually, *Acoustic* bears similarity to the instant case. In *Acoustic,* the contractor essentially had acknowledged that the subcontractors were entitled to the monies claimed due and owing, as did BCC in the present case. The defense suggested by the

4. At the time of the trial in this case, I.C. § 45–511 provided: The original or subcontractor shall be entitled to recover, upon the claim filed by him, only such amount as may be due to him according to the terms of his contract, after deducting all claims of other parties for work done and materials furnished to him as aforesaid, of which claim of lien shall have been filed as required by this chapter, and in all cases where a claim shall be filed under this chapter for work done or materials furnished to any subcontractor, he shall defend any action brought thereupon at his own expense; and during the pendency of such action, the person indebted to the contractor may withhold from such contractor the amount of money for which claim is filed; and in case of judgment upon the lien, the person indebted in the contract shall be entitled to deduct from any amount due or to become due by him to such contractor, the amount of such judgment and costs; and if the amount of such judgment and costs shall exceed the amount due from him to such contractor, if the person indebted in the contract shall have settled with such contractor in full, he shall be entitled to recover back from such contractor any amount so paid by him in excess of the contract price, and for which such contractor was originally the party liable.

contractor in *Acoustic*—as with BCC—was that the contractor was unable to pay the subcontractors' claims because the contractor had not been paid the amount due it from the landowner for the construction work on the landowner's real property. The Supreme Court determined that, although both the landowner and the contractor could be held liable for the attorney fees and costs incurred by the subcontractors in foreclosing their liens, the landowner should be held responsible. The Court's rationale was as follows:

> By permitting the partial summary judgments to be entered against it, the principal contractor ... in effect, admitted that [the subcontractors] were entitled to the monies claimed due and owing. The [landowner], however, retained the money due the principal contractor, and apparently without cause or right contested the garnishment as well as foreclosure proceedings on every point, and litigated the case through the end. By so acting, the [landowner] delayed the [subcontractors] in recovering on the partial summary judgments they were entitled to, and put them to unnecessary legal expense. Under such circumstances, it was proper to allow the [subcontractors] attorney fees payable out of the proceeds of the foreclosure sale of the [landowner's] real property.

103 Idaho at 601, 651 P.2d at 535, *citing De Camp Lumber Co. v. Tolhurst,* 99 Cal. 631, 34 P. 438 (1893).

The difference between *Acoustic* and the instant case lies in the result obtained in the district court. Here the district court levied the subcontractors' expenses against the contractor, not the landowner.

The district court's decision is not necessarily at odds with *Acoustic. Acoustic* does not mandate that a subcontractor's expenses be assessed against only the landowner in every lien foreclosure action. Instead, the case stands for the proposition that the district court there did not commit error in concluding that the assessment against the landowner was appropriate under the circumstances in that case.

The district judge in the present case took the analysis from *Acoustic* a step further. By citing to *Acoustic* he implicitly recognized that—with respect to the subcontractors—it might be appropriate to assess the expenses against the landowner in some circumstances since both the contractor and the landowner could be held liable. However, the judge here was faced with another determination, i.e., as between the landowner and the contractor, which of them should ultimately be responsible for the subcontractors' expenses? He concluded that because the expenses incurred by the subcontractors arose by virtue of contracts formed with the contractor, not with the landowner, and because the contractor was liable for payment of the debts flowing from those contracts, which could have been paid by the contractor in order to avoid the lien foreclosure actions, the contractor ultimately must bear the responsibility for the subcontractors' expenses. In this respect, the district court held that I.C. § 45–511 generally

> intends to protect the property owner and impose upon the next person down in the chain of privity the obligation to either pay the subordinate claims or be liable for the cost incurred by the property owner in defending against such claims. See *Acoustic Specialties, Inc. v. Wright,* 103 Idaho 595, 651 P.2d 529 (1982). The rationale for this position is readily apparent. As between the property owner and the contractor, who has the information concerning the contract between the subcontractor and the contractor? The answer is simply the contractor. The contractor is in the best position to contest the claims of the subcontractor if they are not supported by the agreement between the subcontractor and the contractor. There is nothing wrong with the contractor admitting the amount due to the subcontractor if that amount is not in dispute and thereby reducing significantly the costs of defending against the claims of the subcontractor.

> However the risks inherent in such a course can be demonstrated by the instant case. In this case we have not only the contractor (Bouton) seeking to foreclose his lien for the alleged balance due him, but also several subcontractors seeking to foreclose liens for sums due them. Bouton's lien claim arguably includes all of the

lien claims of the subcontractors. That is not dispositive of this issue. The facts are still undetermined and there are several possibilities.

The court then outlined those possibilities under three scenarios. The court first considered that if, for example, Magnuson has paid BCC every penny to which it is entitled, Magnuson then has to pay the subcontractors the amounts of their claims and recover such amounts together with his costs of defending against the subcontractors' claims from BCC. The court then considered another possibility: if BCC is entitled to some additional compensation from Magnuson, but less than the amount necessary to pay all the claims of the subcontractors, Magnuson then has to pay the subcontractors the amounts of their claims, set that sum off against the amount due BCC, deduct Magnuson's costs of defending against the subcontractors' claims and recover the short fall from BCC. Finally, the court addressed the possibility that if BCC is entitled to compensation from Magnuson in excess of the sums necessary to pay the claims of the subcontractors, Magnuson then has to pay the subcontractors the amounts of their claims, deduct his costs of defending against the subcontractors' claims and pay the surplus to BCC.

Considering these possibilities at the summary judgment stage, the district court concluded that Magnuson was "entitled to partial summary judgment that [BCC] will be liable for the amount of any subcontractor lien claims which are permitted to be foreclosed, together with Magnuson's reasonable costs in defending each of those claims as opposed to costs incurred in defending against the claims of [BCC]."

Following the trial, the district court revisited the issue, but still concluded that BCC should be responsible for the subcontractors' attorney fees and costs for pursuing their lien claims and that Magnuson was entitled to an award for its fees and costs in defending against those claims. Essentially, the district court declined to find that Magnuson's posture in defending against the subcontractors' liens was as egregious as the landowner's conduct in *Acoustic*. After thoroughly reviewing the record in this matter,

we conclude that the district court's decision was correct. Furthermore, our affirmance of the district court's decision in this regard necessarily results in our rejection of another argument raised by BCC, that the district court erred in denying recovery to BCC of consequential damages equal to the amount of fees and costs awarded to Magnuson under I.C. § 45–511.

## VI.

## ATTORNEY FEES BELOW

Aside from the issue of attorney fees relating to the subcontractors' claims which we already have discussed, BCC takes exception to certain aspects of the award of attorney fees to BCC made by the district court. In its request for fees, BCC segregated its claim into three categories: it allocated 25% of the attorney fees and costs incurred, to prosecution of its claim against M & L; 25% were allocated to BCC's claim against Magnuson; and 50% of the fees and costs were allocated to responding to Magnuson's counterclaims. In its order awarding costs and fees, the district court specifically held that BCC had properly apportioned its costs and fees claimed against M & L as 25% of its total, and the court awarded those costs and fees, as apportioned, to BCC. With respect to BCC's claims against Magnuson, the court also accepted BCC's allocation of 25% of its total costs and attorney fees as being attributable "to the prosecution of the lien claims on all theories" against Magnuson. However, because BCC recovered only approximately 8% of its claims against Magnuson, and because BCC failed on its alternative theories utilized in pursuing Magnuson, the court awarded BCC only 2% of its total costs and attorney fees relative to the prosecution of BCC's lien claims. Finally, as to the remaining 50% for responding to Magnuson's counterclaims, the court held: "Neither BCC nor [Magnuson] achieved anything close to what each claimed. In large measure, each was only successful in defeating a portion of the other party's claims. On balance … I find that no party was an I.R.C.P. 54(d)(1)(C) prevailing party." Accordingly, the court de-

clined to award any fees to BCC for defending against Magnuson's counterclaims.

On appeal, BCC questions the court's award in two respects. First, BCC argues that the court erred in determining that BCC was not the prevailing party with regard to Magnuson's unsuccessful counterclaims. Second, BCC asserts that the court overlooked including the amount of $14,765.50 in the sum claimed by BCC for its fees.

### A. Prevailing Party

We affirm the district court's determination with regard to its finding that neither party prevailed for the purpose of an award of fees and costs. While BCC was successful in defending against Magnuson's counterclaims, Magnuson was likewise successful in defending against the quantum meruit, waiver and abandonment claims asserted by BCC. The district court's decision that neither party was a prevailing party for the purpose of an award of fees and costs was a question to be decided within the court's discretion and will be set aside only for an abuse of discretion. *Stewart v. Rice,* 120 Idaho 504, 817 P.2d 170 (1991).

> I.R.C.P. 54(d)(1)(B) specifically directs the trial court, in exercising its discretion, to consider the result in relation to the relief sought in determining who the prevailing party is. In *Sun Valley Shopping Center v. Idaho Power Co.,* 119 Idaho 87, 803 P.2d 993 (1990), we set out the analysis which this Court will make in determining whether or not a trial court has abused its discretion:
>
> > (1) [W]hether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.
>
> [119 Idaho at 94, 803 P.2d at 1000.]

*Stewart,* 120 Idaho at 510–11, 817 P.2d at 176–77. Applying this analysis to the instant case, we conclude that the district court did not abuse its discretion in ruling that there was no overall prevailing party as to the claims between BCC and Magnuson upon which BCC sought recovery for the 50% of its attorney fees and costs incurred.

### B. Additional Sum

As to the $14,765.50 in fees which BCC contends the district court overlooked, the point appears well taken. This amount was submitted to the court by supplemental affidavit preceding the court's calculation of the amount which should be awarded to BCC on its lien claim and the claim against M & L. It should have been taken into account in determining the final amount awarded to BCC under the apportionment process employed by the court. However, the record does not disclose whether this alleged oversight was ever brought to the court's attention by BCC, and the record does not contain any ruling thereon by the court for our review. On remand following remittitur of the appeal, this issue may be pursued at the election of BCC.

### VII.

### THE CROSS APPEAL

As stated earlier, after signing a written contract with Magnuson for the construction of the Wallace Inn, BCC entered into an oral agreement with M & L, the owners of the real property where the motel and the restaurant were to be constructed, to do all of the site work necessary for the dual project. This additional work included surveying, demolition work, debris removal, excavation, structural filling and compaction, grading, paving, sidewalks, lighting and numerous other items of work related to the project. It was understood between BCC and M & L that this additional work would be done on a cost plus basis without any guaranteed maximum price; however, the other provisions of the written contract would apply to this site work.

BCC originally estimated the site-work costs would be about $101,000. As the work proceeded, the owners paid BCC's claimed costs up to the amount of $101,000 but then withheld further payments as though the es-

timated cost was a ceiling on M & L's liability.

The district court found that the reasonable total cost to BCC plus its fee for the site work was $232,814, but that M & L had paid BCC only $100,600, leaving a $132,214 balance owing to BCC from M & L on the oral contract. M & L has cross-appealed from the judgment, contending that BCC failed to prove that its charges for the site work were reasonable. We disagree and for the following reasons we uphold the district court's ruling that M & L is liable for the additional costs for the site work.

In *Fairchild v. Mathews*, 91 Idaho 1, 415 P.2d 43 (1966), our Supreme Court reviewed the trial court's award of damages to a contractor who was seeking compensation from landowners on a quantum meruit basis for work he had performed upon the land. There, the Court concluded:

> No definite rule exists for the determination of whether a recovery on a quantum meruit for services, work and labor, or incidental materials, is excessive, reasonable, or inadequate, but each case is to be determined from the facts and circumstances thereof.

91 Idaho at 6, 415 P.2d at 48. We believe that a similar rule is applicable here.

BCC's witnesses testified extensively about the extent and complexity of the site work that needed to be expedited before foundations could be laid for the Wallace Inn. The extent of this work became apparent in the process of removing visible debris from the surface and buried debris and other material unsuitable as a base for the buildings. Fill material meeting construction standards had to be placed and compacted. This work was done by a local subcontractor who was selected by the parties after they invited proposals which included unit prices for this part of the work. There was substantial and competent evidence at trial showing that the amount of debris removed and the amount of structural material placed on the site was much greater than anticipated. This work was supervised and inspected by representatives of the owners and the contractor. The owners had access to all billings submitted by the subcontractor for this work. Basically, the accepted unit prices for this work determined much of BCC's costs. To that extent at least, there is substantial evidence of the reasonableness of BCC's costs of the site work.

Of course, the site work extended throughout the entire period of construction until the final grading, landscaping, paving and lighting were finished. Two other subcontractors, Aztech Construction and Viking Sprinkler, who were parties in this action below, established the reasonableness of their charges to BCC for their part of the site work. Other evidence in the record shows that BCC, in spite of changes and delays in the construction plans, performed the site work as expeditiously as possible. In its counterclaim, M & L challenged the quality or sufficiency of three or four items of site work but M & L did not prevail on any of these claims. In effect, M & L accepted as reasonable the costs submitted by BCC for payment for the site work until those costs totaled $101,000. M & L then refused payment for all further site work costs either believing that all additional costs were not reasonable or that M & L had no liability for costs exceeding $101,000.

After considering all of the evidence in the record, we conclude that BCC made out a prima facie case that its costs for the site work were reasonable and necessary. In short, there was substantial and competent evidence of the reasonableness of the costs. M & L produced no evidence to prove that any of the claimed costs were unreasonable. Accordingly, we affirm the judgment of the district court in favor of BCC against M & L for breach of the site work agreement.

## VIII.

### ATTORNEY FEES ON APPEAL

Both BCC and Magnuson seek awards for attorney fees incurred in the appeal. BCC claims its fees under I.C. §§ 45–513 and 12–121; while Magnuson makes its claim under I.C. § 12–120.

We decline to make any award of attorney fees to either party. It has frequently been held that I.C. § 45–513 is not applicable to

**974**

appeals in lien foreclosure actions. *Olsen v. Rowe,* 125 Idaho 686, 873 P.2d 1340 (Ct.App. 1994); *Beall Pipe & Tank Corp. v. Tumac Intermountain, Inc.,* 108 Idaho 487, 700 P.2d 109 (Ct.App.1985); *W.F. Constr. Co. v. Kalik,* 103 Idaho 713, 652 P.2d 661 (Ct.App.1982). An award under I.C. § 12–121 will be made only if the reviewing court is left with the abiding belief that the appeal has been brought, pursued or defended frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). Here, we are not left with such a belief. Finally, as to Magnuson's claim under I.C. § 12–120, because we are remanding this case for further proceedings, we conclude that neither party has prevailed on this appeal. Accordingly, no award for attorney fees will be made.

Further, due to the mixed result in this case, the court concludes that all parties should bear their own costs. No costs are awarded.

### CONCLUSIONS

In summary, we hold that the district court was correct in ruling that the parties' cost plus contract was subject to a GMP, which was not waived. The initial GMP, set at $1,790,643, was increased during construction as a result of changes directed by the owner and the owner's agents even though the change order procedure was generally not followed. The contractor did not lose its right to seek increases to and adjustment of the GMP either because of delay or because of its failure to strictly comply with the change order provisions in the contract. Because of changes and other delays in producing the "final contract documents," the contractor was prevented from seeking a timely adjustment of the GMP under Article 5.2.1A of the contract. We remand the case to the district court to consider the proof made and the proof offered by BCC to establish its increased costs due to delays and changes caused by the owner and its agents. On M & L's cross-appeal, we affirm the district court's ruling. We generally uphold the district court's rulings on costs and attorney fees, except upon remand the district court shall determine whether $14,765 of the contractor's fees were overlooked and should be taken into account in the apportionment process employed by the court.

Finally, we decline to award costs or attorney fees to any party on appeal.

WALTERS, C.J., and CAREY, J. Pro Tem., concur.